IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-cv-204

ROSALIND MCCLELLAND,

*Plaintiff,*

v.

**COMPLAINT AND JURY DEMAND**

HOUSING AUTHORITY OF THE
COUNTY OF WAKE, NORTH
CAROLINA,

*Defendant.*

Plaintiff Rosalind McClelland, by and through her counsel, the law firm of Williams & Ray, PLLC, for her Complaint and Jury Demand alleges the following:

## I. INTRODUCTION

1. After taking FMLA leave to accommodate her disability, Plaintiff Rosalind McClelland ("Plaintiff" or "Ms. McClelland") returned to her position at the Housing Authority of the County of Wake ("HACW") only to have all of her prior job duties reassigned to other employees. Then, less than two weeks after returning from leave, Ms. McClelland's employment was terminated. Plaintiff McClelland hereby alleges claims for relief for violation of her rights under the Americans with Disabilities Act, ("ADA") pursuant to 42 U.S.C. § 12112, § 12203, *et. seq.* and under the Family Medical Leave Act ("FMLA") pursuant to 29 U.S.C. § 2601, *et seq.*

## II. PARTIES

2. Plaintiff is a resident of the town of Zebulon, North Carolina. Plaintiff was employed by the County of Wake ("Wake" or the "County") as the Deputy Executive Director of the Housing Authority at the time of her termination on June 30, 2020.

3. Defendant Housing Authority of the County of Wake is a federally, state, and locally funded public housing authority organized and existing pursuant to the United States Housing Act of 1937, 42 U.S.C. § 1437, *et. seq.* ("USHA"), N.C. Gen. Stat. Ch. 157 and the Annual Action Plan approved by the Wake County Board of Commissioners. Defendant HACW is a municipal corporation organized under North Carolina law for the purpose of providing sanitary, low-cost housing to moderate and lower-income families and individuals. HACW is subject to the Code of Wake County, North Carolina, Equal Employment Opportunity § 31.04, *et seq.* The Code requires HACW to comply with all federal, state, and local laws ensuring no employment discrimination of any kind.

## III. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 29 U.S.C. § 2601, *et seq*, and 42 U.S.C. § 12112, *et. seq.*

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendant HACW is located within the Western Division of the Eastern District of North Carolina, and all relevant events stated herein that give rise to this Complaint occurred within this district.

6. Ms. McClelland has complied with all administrative, jurisdictional, and legal prerequisites for the filing of this action. Specifically, Ms. McClelland filed a Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission ("EEOC")

alleging, *inter alia*, discrimination based on her disability. The EEOC provided Ms. McClelland with a notice granting her the right to sue HACW.

## IV. FACTUAL ALLEGATIONS

### A. Ms. McClelland's Employment and Disabilities Background

7. Ms. McClelland is a veteran of the Army National Guard who suffers from five disabilities that significantly impact her daily life activities. Specifically, Ms. McClelland suffers from: PTSD, depression, anxiety, ADHD, and severe migraines.

8. Ms. McClelland has been employed as a social worker for over 25 years. Throughout her career, Ms. McClelland successfully managed her disabilities with occasional accommodations, most often in the form of leave.

9. Ms. McClelland began working for HACW in 2011. Ms. McClelland's performance while working for the HACW was nothing short of outstanding. Throughout her tenure, she received fantastic annual performance evaluations and was granted the maximum allowable pay raises each year. Indeed, Ms. McClelland never received any discipline or counseling while at HACW.

10. In July of 2014, Ms. McClelland was promoted to the position of Executive Assistant to the Chief Executive Officer and Resident Coordinator of HACW. In 2018, while continuing to serve in her Executive Assistant and Resident Coordinator roles, Ms. McClelland also became a Human Resources Manager for HACW.

11. In her role as the Executive Assistant to the CEO, Ms. McClelland was responsible for much of the day-to-day functioning of the Housing Authority, which ranged from supervision of various employees to providing IT support where needed. Moreover, when HACW's CEO was absent, Ms. McClelland's would act on the CEO's behalf.

12. During Ms. McClelland's tenure, the HACW was divided into three main departments: Finance, Housing, and Maintenance.

13. In May 2019, the Director of Housing resigned, and shortly thereafter, the HACW CEO resigned. As a result, in June of 2019, Ms. McClelland was appointed by the HACW Board of Commissioners to serve as the Interim CEO.

14. As the Interim CEO, and with the Director of Housing position vacant, Ms. McClelland managed virtually all aspects of the HACW. Specifically, she supervised the Finance and Maintenance Departments, she supervised Lisa Chester, who was the Public Housing Manager and Phillip Banks, who was the Housing Choice Voucher Manager (both of whom were previously supervised by the Director of Housing), and she continued to serve in her role as the HR Manager.

15. Ms. McClelland served as interim CEO for approximately one month until the previous CEO returned in July 2019 on a temporary contract that lasted until December 2019.

16. Between July 2019 and December 2019, Ms. McClelland continued to supervise Ms. Chester and Mr. Banks in addition to retaining her previous responsibilities.

17. In September 2019, HACW's Board of Commissioners changed Ms. McClelland's job title to the Deputy Executive Director of the Housing Authority; the position she held at the time she was wrongfully terminated less than one year later.

18. In this role, Ms. McClelland's obligations from her prior role continued. Specifically, her responsibilities that related to her Executive Assistant position, her Human Resources Manager position, providing IT support, and supervising Roberta Shields, Lisa Chester, Phillip Banks, and Clinton Jenkins all remained. Additionally, as part of this role, the Director of Housing position was eliminated, and Ms. McClelland was tasked with those job responsibilities.

As part of this promotion, her supervision of the Finance Manager was transferred to the CEO, which is the normal chain of command for housing authorities.

19. To ensure she was qualified to take on these many responsibilities, Ms. McClelland was directed to, and took two, one week-long training courses on both Public Housing Executive Management and Housing Choice Voucher Executive Management.

20. These two training courses were directly related to the newly assigned Director of Housing responsibilities.

21. In December 2019, upon expiration of the CEO's temporary contract, the Board of Commissioners once again appointed Plaintiff McClelland to serve as the Interim CEO of HACW until Dawn Fagan transitioned into the role in January 2020.

22. In January 2020, Dawn Fagan began working as the Executive Director for HACW. The Executive Director position is the same position as the CEO but was retitled in December 2019.

23. Ms. McClelland worked directly with Ms. Fagan in getting her up to speed with the duties of the Executive Director position. During these interactions, Ms. McClelland disclosed to Ms. Fagan that she was a disabled veteran who suffered from various disabilities including, among other things, migraines.

24. On February 10, 2020, Ms. McClelland contacted Ms. Fagan and informed her that she needed to take a mental health day due to a severe migraine that had persisted from the weekend.

25. When Ms. McClelland returned from leave the following day and entered Ms. Fagan's office to see if she needed anything, Ms. Fagan was cold, short, and acted as though she had no interest in talking to Ms. McClelland. Ms. Fagan also snapped at Ms. McClelland and

**5**/15

Case 5:22-cv-00204-M   Document 7   Filed 05/23/22   Page 5 of 15

raised her voice toward her during a meeting in which Ms. McClelland attempted to share a concern the maintenance staff had brought to her attention.

26. Additionally, when Ms. McClelland inquired with Ms. Fagan about attending a Board Meeting the following day, Ms. Fagan specifically directed her to not attend that meeting, or any future board meetings.

27. Plaintiff McClelland had regularly attended board meetings for the past six years, as it was standard operating procedure for the Deputy Executive Director of the Housing Authority to do so.

28. As a result of Ms. Fagan's behavior and Ms. McClelland's fear of retaliation by Ms. Fagan, Ms. McClelland submitted a complaint directly to the Board of Commissioners to discuss Ms. Fagan's recent treatment of her. Ms. McClelland outlined her concerns and described that Ms. Fagan's treatment created a hostile work environment and caused her significant stress. In this complaint, Ms. McClelland noted that she feared retaliation, and hoped to meet with the Commissioners to discuss her concerns about Ms. Fagan.

29. Instead of meeting with Ms. McClelland or investigating the matter, the Board of Commissioners informed Ms. Fagan of Ms. McClelland's complaint. Rather than responding to the complaint, the Board instead directed Ms. Fagan to respond to Ms. McClelland personally and inform her that the Board had directed Ms. Fagan to coordinate a meeting between Ms. McClelland and the Housing Authority's attorney "to discuss allegations and see if they can work things out."

30. Involvement of the Housing Authority's attorney severely heightened Ms. McClelland's anxiety and caused her to believe she needed to retain her own legal counsel in advance of any meeting with the attorney, who would be serving in a position that was adverse to her. Ultimately, the meeting did not occur.

31. Ms. Fagan's hostile behavior toward Ms. McClelland continued to escalate. Toward the end of February, Ms. McClelland requested to attend a webinar training that another employee was also attending. Ms. McClelland also asked for Ms. Fagan to train her in certain areas so that Ms. McClelland could perform various tasks in a manner that Ms. Fagan expected. Ms. Fagan both refused to permit Ms. McClelland to attend the webinar training, and perfunctorily said that she would discuss a training plan for her at some unknown time in the future, which never happened.

32. The increasingly hostile work environment heightened Ms. McClelland's disabilities to the point that Ms. McClelland needed to take extended medical leave. She sought and was granted 12 weeks of Family Medical Leave Act ("FMLA") leave starting on March 13, 2020 to accommodate her disabilities. The request spelled out a number of symptoms, including that her disabilities were making it difficult for her to meet certain deadlines.

33. Before taking leave, Ms. McClelland applied for a different, Executive Assistant position within HACW. The duties of this position were all duties that Ms. McClelland had previously handled for several years and was more than qualified to perform.

34. While out on FMLA leave, Ms. McClelland interviewed with Ms. Fagan for the Executive Assistant position. During the interview, Ms. Fagan asked Plaintiff McClelland specifically about what Ms. McClelland planned to do to ensure deadlines were not missed in the future. Because Ms. McClelland had never missed a deadline in the past, this question was undoubtedly in reference to the symptom listed in her recent FMLA request.

35. Ms. Fagan also used the interview as an opportunity to confront Ms. McClelland about the complaint she had made to the Board of Commissioners about Ms. Fagan's behavior.

36. Rather than hire Ms. McClelland for the Executive Assistant position, Ms. Fagan split the position into two roles — one with assistant duties, and another with HR/Procurement

duties — and hired two external candidates, both of whom were less qualified than Ms. McClelland. As it related to the Executive Assistant position, one of the external hires possessed no experience working for a housing authority and only had background as an assistant to celebrities.

37. On May 4, 2020, while Ms. McClelland was on leave, Ms. Fagan created and posted an advertisement for the Director of Housing position. The job duties listed for this position were the same as those Ms. McClelland was currently engaged in as Deputy Executive Director prior to using FMLA leave and the same duties that Ms. McClelland has been successfully completing since June 2019.

38. Ms. Fagan did not inform Ms. McClelland of the listed position, despite knowing that Ms. McClelland was actively applying for a different position, despite the fact that Ms. McClelland's current job duties were almost identical to the duties for the listed position, despite Ms. McClelland attending and receiving certifications for two, one week-long training courses which were directly related to the listed position, and despite Ms. McClelland being otherwise qualified for this position.

39. Ms. Fagan also did not inform Ms. McClelland of the listed position despite knowing that her access to email while on FMLA leave was significantly limited and that without being personally informed of the job posting, it was incredibly unlikely that Ms. McClelland would receive notice of its existence.

40. Ms. Fagan only held the job posting open for the minimum amount of time that was statutorily required. Common practice of the HACW was to hold job postings open far longer than the minimum requirment.

41. As a result, the position was offered to an external candidate who, upon information and belief, was promised the position by Ms. Fagan prior to the position even being posted.

42. When Ms. McClelland returned from leave on June 1, 2020, every single job responsibility Ms. McClelland was engaged in as the Deputy Executive Director prior to taking FMLA leave was permanently reassigned to someone else. All of Ms. McClelland's responsibilities and direct reports had been removed by Ms. Fagan. Specifically:

    a. All of the duties related to IT support were permanently reassigned to the Executive Assistant;

    b. All of the duties related to Human Resources were permanently reassigned to the new HR/Procurement position created by Ms. Fagan;

    c. All of the duties related to supervision of Lisa Chester and Phillip Banks were permanently reassigned to the new Director of Housing;

    d. All of the duties related to the supervision of Roberta Shields were permanently reassigned to the Finance manager; and

    e. All of the duties related to the supervision of Clinton Jenkins and the Maintenance Department were permanently reassigned to the new Director of Housing.

43. Instead of restoring Ms. McClelland's role to her previous or equivalent job as required under the FMLA, Ms. Fagan transferred all Ms. McClelland's responsibilities to other positions and stripped her supervisory authority and assistance by permanently reassigning her direct reports. Thus, Ms. McClelland became the Deputy Executive Director in name only.

44. Ms. Fagan instead assigned Ms. McClelland only three discrete and finite tasks upon her return to work: 1) work with the consultant that she hired to create a five-year plan, 2) revise the policies and procedures for inventory, and 3) gather board packets. These tasks were all limited in scope and duration. They were not tasks Ms. McClelland had previously performed and they did not represent an equivalent position to the job she held prior to taking FMLA leave.

45. Upon her return from leave, Ms. McClelland was also informed that Ms. Fagan did not want her speaking with any of the other employees from that time forward.

46. On June 12, 2020, less than two weeks after returning from leave, Ms. McClelland was terminated, effective June 30, 2020.

47. The termination letter listed no explicit reasons for Ms. McClelland's termination. The letter merely stated, "[t]his letter is to notify you that your employment with the Housing Authority of the Count of Wake is terminated effective June 30, 2020. In accordance with Section 3 of the HACW Personnel Policy manual (Page 6 – Employment at Will)." [sic].

48. The termination letter was given with no explanation into the reasons and with no instruction that other positions with HACW would be open soon.

49. Following her termination, Ms. McClelland filed a charge of discrimination and retaliation with the EEOC.

50. In its position statement submitted to the EEOC, HACW admitted that it reassigned Ms. McClelland's job responsibilities but, for the first time, alleged that the reassignment and subsequent termination was not discriminatory or retaliatory but instead it was the result of a reorganization of HACW undertaken by Ms. Fagan.

51. HACW's reasoning is pretextual and a clear attempt to mask Ms. Fagan's true motivation which was to terminate Ms. McClelland. The pretextual nature of this allegation is demonstrated in several ways.

52. First, a closer look at the alleged "reorganization" reveals that the proposed changes were little more than shuffling titles and not some systemic change.

53. Additionally, Ms. Fagan did not undertake any steps toward this alleged reorganization until early May 2020, nearly two months into Ms. McClelland's protected leave. Indeed, the alleged reorganization consisted of eliminating Ms. McClelland's position and creating

**10**/15

other positions that took on many of her prior job responsibilities. Significantly, Ms. McClelland was not offered any of these new positions and at least one of the new positions is unfilled and has remained unfilled since its creation.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Unlawful Discrimination and Retaliation in Violation of the Americans with Disabilities Act

54. Plaintiff hereby incorporates all foregoing paragraphs as though fully alleged herein.

55. Plaintiff was more than qualified to retain her Deputy Executive Director position or be hired for the Executive Assistant position with reasonable accommodations. This is evidenced by the fact that Plaintiff successfully performed her job duties for almost a decade.

56. Plaintiff has five disabilities. Specifically, Plaintiff suffers from PTSD, anxiety, depression, migraines, and ADHD.

57. These disabilities substantially limit Plaintiff's ability to perform major life activities including, among other things, concentrating, thinking, working, and communicating.

58. Plaintiff engaged in protected conduct when she filed a complaint against Ms. Fagan directly with the Board of Commissioners and when she exercised her right to take 12 weeks of FMLA leave as an accommodation for her disabilities.

59. Plaintiff was discriminated and retaliated against when Defendant terminated her employment because of her disabilities, because she sought reasonable accommodations for her disabilities and because she filed a proper complaint against Ms. Fagan.

60. Defendant's alleged non-discriminatory reasons for its behavior are pretextual.

61. As a result of Defendant's unlawful conduct, Plaintiff has sustained damages, including lost wages and benefits, compensatory damages for future pecuniary losses, emotional

pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary loss, as well as attorney's fees and costs.

## SECOND CLAIM FOR RELIEF

### Unlawful Discrimination and Retaliation in Violation of the FMLA

62. Plaintiff hereby incorporates all foregoing paragraphs as though fully alleged herein.

63. Plaintiff was entitled to take leave under the FMLA. FMLA allows eligible employees to take 12 weeks of leave during any 12-month period for a serious health condition.

64. Under 29 U.S.C. §2614, when an eligible employee takes leave and then returns to work, the employee's position must be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment that were present when the employee's leave commenced.

65. It is unlawful if an employer interferes with an employee's rights to leave or reinstatement of duties under the FMLA.

66. Plaintiff returned to work after taking her approved FMLA leave. Plaintiff was not restored to her previous position or an equivalent position. Instead, Plaintiff was assigned three discrete and finite tasks, and all of her job duties had been reassigned to other employees.

67. Plaintiff was then terminated by the Defendant approximately two weeks after returning to work in retaliation for taking FMLA leave.

68. Defendant's alleged non-discriminatory reasons for its behavior are pretextual.

69. As a result of Defendant's unlawful discriminatory and retaliatory conduct, Plaintiff has sustained damages, including lost wages and benefits, liquidated damages, and attorney's fees and costs.

## JURY TRIAL DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff McClelland respectfully requests that this Court enter a judgment in her favor and against the Defendant and award the following:

(a) Injunctive, declaratory, and prospective relief as allowed by law;

(b) Damages in such amount as shall be proven at trial for lost back pay and damages including lost benefits, wages, promotions, tenure, seniority, and other employment opportunities;

(c) An order to reinstate Plaintiff McClelland, or in the alternative, front pay and benefits in an appropriate amount;

(d) Nonpecuniary compensatory damages;

(e) Liquidated damages as allowed by law;

(f) Punitive damages;

(g) Attorney's fees and costs as provided for by law;

(h) Pre- and post-judgment interest as provided for by law; and

(i) Such other relief as the Court deems just or proper.

Respectfully submitted on this 20th day of May 2022.

**Williams & Ray, PLLC:**
*Attorneys for Plaintiff*

Adam W. Ray
Attorney at Law
  Bar No.: 57035
  Williams & Ray, PLLC
  555 Fayetteville St., Ste. 201
  Raleigh, NC 27601

**13**/15

Case 5:22-cv-00204-M   Document 7   Filed 05/23/22   Page 13 of 15

Phone: (888) 315-3841
Fax: (303) 502-5821
Email: aray@williamsray.com

<u>Plaintiff's Address</u>
1444 Smokey Mountain Drive
Zebulon, NC
27597

**14**/15

Case 5:22-cv-00204-M   Document 7   Filed 05/23/22   Page 14 of 15

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document has been duly served on all counsel of record by filing it with the Clerk of the Court using the CM/ECF System.

This date, Friday, May 20, 2022.

**Williams & Ray, PLLC:**
*Attorneys for Plaintiff*

_____
Adam W. Ray
Attorney at Law
  Bar No.: 57035
  Williams & Ray, PLLC
  555 Fayetteville St., Ste. 201
  Raleigh, NC 27601
  Phone: (888) 315-3841
  Fax: (303) 502-5821
  Email: aray@williamsray.com